*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

CORY JAMES WATSON,

Defendant-Appellant.

UNPUBLISHED
December 10, 2020

No. 349242
Oakland Circuit Court
LC No. 2018-269235-FH

Before: LETICA, P.J., and RIORDAN and CAMERON, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of assault by strangulation or suffocation, MCL 750.84(1)(b), interfering with electronic communications, MCL 750.540, and domestic violence, second offense, MCL 750.81(4). Defendant was sentenced to 6½ to 10 years' imprisonment for assault by strangulation or suffocation, 1 to 2 years' imprisonment for interfering with electronic communications, and 190 days in jail with credit for time served, for domestic violence, second offense. We affirm.

## I. BACKGROUND

This case arises from an incident that occurred at the apartment of defendant's former romantic partner, AD. AD testified that, for a period of one to two hours, defendant interrogated her regarding supposed sexual infidelities, calling her a liar and slapping her multiple times. AD testified that defendant took her current cell phone, broke her previous cell phone, strangled her for about a minute, and attempted to suffocate her with a couch cushion. Photographs of AD's various injuries were published to the jury.

On two recent occasions, AD's neighbor had overheard a male voice, that she assumed belonged to defendant, cursing at AD. This night, over the course of two hours, AD's neighbor heard the same male voice screaming: "[Y]ou f****** b****; why did you lie to me" over and over. The neighbor also heard something that she had never heard before, "things being knocked around." And, after hearing a female voice say "help" and "stop it," AD's neighbor immediately called 911.

-1-

The police arrived quickly. Officer David Ratliff heard a man screaming and saw a woman seated on the couch with her hands in her face as the defendant stood in front of her. When the police knocked, a shirtless defendant answered. The police explained that they were there on a noise complaint. Defendant said he and AD had been arguing, heatedly, but everything was okay. The police asked if they could come in and AD appeared to be mouthing the word "please."

Separated from defendant, an extremely distraught AD shared a highly similar account of defendant's assaults with Officer Ratliff immediately following the incident. Defendant remained in the apartment with Officer Kevin Gibson. Defendant told Officer Gibson to just arrest him. Defendant was emptying his pockets. Officer Gibson asked defendant what he was talking about. Defendant reported that AD was cheating on him and that they were having a very loud argument. As defendant had removed two telephones from his pockets, Officer Gibson questioned him about them and defendant stated that one of them was his while the other belonged to AD. The audio from Officer Gibson's body camera footage was admitted at trial.

When later questioned by Officer Ratliff, defendant denied hitting or striking AD, and claimed she was scared because he was being "overly aggressive" by screaming in her face about her alleged infidelity. Confronted about AD's visibly swollen face, defendant claimed it was "probably from her crying and putting her hands on her face." Later, however, defendant stated that it was possible that he might have had physical contact with AD. Officer Ratcliff's body camera recorded defendant's statements, and they, too, were played for the jury. The police then arrested defendant.

At trial, the prosecution presented testimony from defendant's former romantic partners. KS testified that defendant had, years ago, choked her until she lost consciousness, twice. KS reported defendant's assaults to the police and photographs of KS's injuries were published to the jury. Another former romantic partner, EM, testified that defendant had thrown a beer in her face the day she underwent LASIK eye surgery, and that he had choked her as well. EM did not report the assault to the police.

AD also testified about prior domestic incidents with defendant. They included profanity-filled texts that defendant sent her shortly before this incident. Defendant's texts were wide-ranging, suggesting AD was overweight, promiscuous, and should commit suicide.

The jury convicted defendant on all counts. Defendant now appeals.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL/RIGHT TO MAINTAIN INNOCENCE

Defendant argues that 1) his trial counsel was constitutionally ineffective for conceding defendant's guilt of domestic violence and referring to defendant as "not a good person" and a "monster" during closing argument, and 2) a structural error occurred when trial counsel conceded defendant's guilt of domestic violence without defendant's consent. We disagree.

"[A] defendant must move the trial court for a new trial or evidentiary hearing to preserve the defendant's claim that his . . . counsel was ineffective." *People v Lane*, 308 Mich App 38, 68; 862 NW2d 446 (2014). Defendant did not move the trial court for a new trial or evidentiary hearing in the trial court. And, although he filed a motion with this Court, requesting to remand this case so he could move in the trial court for a new trial, he failed to persuade this Court that

remand was necessary. *People v Watson*, unpublished order of the Court of Appeals, entered February 21, 2020 (Docket No. 349242). Therefore, review of this issue is limited to the existing record. *Lane*, 308 Mich App at 68.

"Whether a person has been denied effective assistance of counsel is a mixed question of fact and constitutional law." *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). Findings of fact "are reviewed for clear error," while constitutional determinations are reviewed de novo. *Id*. "Clear error exists if the reviewing court is left with a definite and firm conviction that the trial court made a mistake." *People v Armstrong*, 490 Mich 281, 289; 806 NW2d 676 (2011).

Defense counsel was not constitutionally ineffective when he acknowledged the strong evidence of defendant's poor character and his guilt of domestic violence because defense counsel reasonably concluded that doing so provided the best opportunity to persuade the jury that, although the evidence established other violent acts and poor character, it did not establish that defendant strangled or suffocated AD. Likewise, defendant's Sixth-Amendment-guaranteed autonomy was not violated because he has not established that he expressed disagreement with trial counsel's concession strategy until after he was convicted and sentenced.

The United States Supreme Court has held that the United States Constitution's Sixth Amendment right to counsel "is the right to effective assistance of counsel." *Strickland v Washington*, 466 US 668, 686; 104 S Ct 2052; 80 L Ed 2d 674 (1984) (quotation marks and citation omitted). This right "is incorporated to the states by the Due Process Clause of the Fourteenth Amendment." *People v Vaughn*, 491 Mich 642, 670; 821 NW2d 288 (2012). Moreover, our Supreme Court has held that the Michigan Constitution provides an identical right that must be analyzed under an identical test. *Id*. at 670, n 104.

> [E]stablishing ineffective assistance requires a defendant to show (1) that trial counsel's performance was objectively deficient, and (2) that the deficiencies prejudiced the defendant. Prejudice means "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." [*People v Randolph*, 502 Mich 1, 9; 917 NW2d 249 (2018), quoting *Strickland*, 466 US at 694.]

Under the objective reasonableness prong of the *Strickland* test, "[t]here is a presumption that counsel was effective, and a defendant must overcome the strong presumption that counsel's challenged actions were sound trial strategy." *People v Cooper*, 309 Mich App 74, 80; 867 NW2d 452 (2015); see also *Strickland*, 466 US at 689 ("[A] court must indulge [in] a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ."). Thus, a reviewing court must "affirmatively entertain the range of possible reasons . . . counsel may have had for proceeding as they did." *Vaughn*, 491 Mich at 670 (quotation marks and citations omitted). "This Court will not substitute its judgment for that of counsel regarding matters of trial strategy, nor will it assess counsel's competence with the benefit of hindsight." *People v Rockey*, 237 Mich App 74, 76-77; 601 NW2d 887 (1999).

"[I]t is only a complete concession of [the] defendant's guilt which constitutes ineffective assistance of counsel." *People v Krysztopaniec*, 170 Mich App 588, 596; 429 NW2d 828 (1988). But acceding to a defendant's guilt on a lesser charge or charges may be a legitimate trial strategy. *People v Wise*, 134 Mich App 82, 98; 351 NW2d 255 (1984). See also *People v Emerson (After Remand),* 203 Mich App 345, 349; 512 NW2d 3 (1994) (declining to "second-guess counsel's trial tactic of admitting guilt of a lesser offense."); *People v Shultz*, 85 Mich App 527, 532; 271 NW2d 305 (1978) ("An attorney may well admit guilt of a lesser included offense in hopes that due to his candor the jury will convict of the lesser offense instead of the greater."). In *Wise*, the defense attorney conceded the defendant's guilt to two lesser charges, noting the defendant had confessed to those crimes and that the "defendant's credibility would have been lost if he had testified denying any involvement at all." 134 Mich App at 98. The *Wise* panel recognized that the " 'tactic of admitting what the evidence strongly demonstrates at the same time as denying other elements or other crimes before the jury' " may be sound trial strategy. *Id*. at 98-99, quoting *United States v Trapnell*, 638 F2d 1016, 1028 (CA 7, 1980).

In this case, trial counsel began his closing argument by stating that the jury was "not here to decide" any fact regarding defendant's other acts evidence as introduced through the testimony of KS, EM, and AD. Agreeing with the prosecutor's remarks, trial counsel argued, "we're not here to decide . . . what kind of person [defendant] is. We've already decided that. Let's be honest." Addressing the other-acts evidence, defense counsel continued:

> [The prosecution] brought it in for a reason . . . . The reason is that they need to create a monster. And he is. I mean, I'm not going to sit here and say he's a great guy. . . . I'm not sure that the words jackass or asshole really apply, because they're not enough. You read the texts . . . . He's not a good person, so let's just say he's a monster. Okay. Let's get that out of the way right now. Let's put that aside for a minute and just talk about the incident . . . .

Trial counsel then argued that the prosecution wanted the jury to believe that AD "was struck 20 times in the face over the course of a couple hours" and forcefully struck each time. He admitted that AD's bruises were real; nevertheless, if she were struck as hard as she claimed as many times as she claimed, it was "surpris[ing]" that she did not sustain any fractures to her jaw or orbital bone. Trial counsel argued that, because the photographs depicting AD's injuries were sufficient to find defendant guilty of domestic violence, the jury should do so:

> I'm going to make things real easy. Let's start with count three, the domestic violence[;] find him guilty. He did it. I can't look at those pictures, and he can't look at those pictures and deny it. He can't do it. It's not possible. I mean, I could. I could say [']no, it didn't happen and she's lying.['] I'm not going to because I'm not taking you for fools[,] because I'm not a fool.

> So find him guilty of domestic violence. It's really simple. Now, do I believe that there is some exaggeration going on? Yes. I don't believe there was 20 hits . . . .

Thereafter, trial counsel stated: "Our focus comes down to that strangulation/suffocation issue." Counsel argued that KS testified that defendant put her in a chokehold. He argued that photographs showed that the chokehold caused major bruising across KS's neck "[n]ot days later,

-4-

[but] immediately." He argued that if AD was telling the truth about defendant putting his entire weight on her neck for a full minute, her neck should have displayed bruising similar to or worse than KS's. However, he argued, the photographs showed "a couple of abrasions on [AD's] neck . . . ." The subsequent photographs showed "[n]othing on the front of [AD's] neck, no major bruising on the side." Trial counsel further noted that AD's speaking voice was unaffected on the police audio recordings, and that AD did not cough or gag; instead, AD only claimed that her vision became "fuzzy."

Trial counsel continued, "so set that aside for a minute. If she wasn't strangled, then she must have been suffocated." But trial counsel argued that the rough texture of the couch cushion, as seen in the photographs of AD's apartment, should have caused "rug-burn" on AD's face. Instead, the photograph of the couch taken after the police arrived showed that the cushions were "placed back carefully, even fluffed up a little bit." Counsel stated, "Again, the physical evidence is not matching up with what [AD's] claiming happened. It just doesn't match up."

Trial counsel further told the jury that finding defendant "guilty of a suffocation or a strangulation is not supported by the physical evidence. We need more." Reviewing the reasonable doubt standard, counsel reiterated his points regarding the lack of physical evidence, and asserted that the jury could not lawfully find defendant guilty of assault by strangulation or suffocation. Counsel implored the jury to "check the not guilty box on [the strangulation] count . . . because that's the truth. That's what really happened. You know it. I know it. They know it."

Defendant argues that trial counsel's statements regarding defendant's character, and his concession that defendant was guilty of domestic violence, constituted ineffective assistance of counsel. Review of trial counsel's argument establishes that the tactics of which defendant complains formed a reasonable trial strategy. The prosecution presented a wealth of inculpatory evidence at trial. The jury reviewed text messages defendant sent the day before the incident, in which he called AD a "a fat, lying sack of s***," among other vulgarities directed at her weight and her supposed sexual infidelity. He threatened to "expose" her lies. AD recounted the assault in great detail, and her account at trial was largely consistent with what she told the responding police office while in a distraught state immediately following the incident. AD, KS, and EM further testified in detail about defendant's other acts of domestic violence, which were admissible under MCL 768.27b. On top of this, the jury viewed photographs of AD's injuries and the disarray of the apartment following the incident; it listened to body camera audio recorded immediately following the incident, and further viewed photographs of the injuries KS had sustained years earlier.

Defendant faults trial counsel for acknowledging the evidence of defendant's poor character and his guilt of misdemeanor domestic violence. But presented with the evidence of other acts of domestic violence, admissible under MCL 768.27b, the photographs explicitly depicting AD's injuries, and defendant's recorded statement that the police should just arrest him, counsel proceeded with the option of recognizing what the evidence strongly suggested. Moreover, counsel was present in the courtroom as this evidence was presented and presumably gauged the jurors' reactions to it. Counsel further tempered his remarks by explaining that, even if the jurors accepted the prosecution's attempt to portray defendant as a monster via the other-acts testimony, the jury nevertheless had to focus on the evidence pertaining to the felony assault

charge—evidence that counsel argued was lacking. And counsel bolstered his arguments, noting that the issue was not defendant's character, but whether the prosecution had carried its high burden of proof on the felony assault charge. Similarly, counsel's concession of guilt on the misdemeanor domestic violence offense provided defendant was his best chance of acquittal on the assault by strangulation or suffocation charge—an offense which carried 10 times the maximum penalty of misdemeanor domestic violence. In sum, trial counsel not only acknowledged the inculpatory evidence, especially the photographs depicting AD's injuries, to concede the misdemeanor charge, but also explained to the jury precisely how the damaging other-acts' evidence and the physical evidence failed to establish defendant's guilt of the felony assault charge.

Defendant further argues that trial counsel's concession as to the misdemeanor domestic violence charge was effectively a concession to all the charges. This argument is meritless. Trial counsel argued vigorously and at length that the physical evidence contradicted AD's testimony regarding strangulation and suffocation. Therefore, trial counsel's acknowledgement of defendant's poor character and his guilt of misdemeanor domestic violence constituted reasonable trial strategy. *Rockey*, 237 Mich App at 76-77; *Wise*, 134 Mich App at 98. And, given the wealth of inculpatory evidence against defendant and defendant's option of arguing he committed no misdemeanor domestic violence, defendant cannot show a reasonable probability that the outcome of the proceedings would have been different if trial counsel had chosen this other strategy. Therefore, defendant has not carried his burden of establishing that trial counsel was constitutionally ineffective, and defendant is not entitled to a new trial.

Defendant additionally argues that trial counsel's concession that defendant was guilty of domestic violence violated defendant's Sixth-Amendment-guaranteed right to maintain his innocence. In *Vaughn*, our Supreme Court stated that "a narrow class of foundational constitutional rights that 'are of central importance to the quality of the guilt-determining process and the defendant's ability to participate in that process' " are "preserved absent a [defendant's] personal waiver . . . ." 491 Mich at 655-656 (quoting *State v Butterfield*, 784 P2d 153, 156 (Utah, 1989). The "narrow class" of rights not subject to preservation requirements includes the right to be represented by counsel and the right to plead not guilty. *Id*. In *McCoy v Louisiana*, __ US __; 138 S Ct 1500, 1508; 200 L Ed 2d 821 (2018), the United States Supreme Court stated that the right to maintain one's innocence against counsel's advice is of the same class as other "decisions . . . reserved for the client—notably, whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal." Therefore, because the right asserted here is highly similar to the right to plead not guilty, it is of the "narrow class" not subject to preservation requirements. The *McCoy* Court held that, unlike a violation of a defendant's right to effective assistance of counsel, "[v]iolation of a defendant's Sixth Amendment-secured autonomy ranks as error of the kind our decisions have called 'structural'; when present, such an error is not subject to harmless-error review." *Id*. at 1511.

This Court reviews constitutional questions de novo, and, if structural error occurred, "automatic reversal is required." *People v Swilley*, 504 Mich 350, 370; 934 NW2d 771 (2019) (quotation marks and citations omitted).

In *McCoy*, 138 S Ct at 1506, the defendant was charged with three counts of first-degree murder, and the prosecution sought the death penalty. Defense counsel "concluded that the

evidence against McCoy was overwhelming and that, absent a concession at the guilt stage that McCoy was the killer, a death sentence would be impossible to avoid at the penalty phase." *Id*. Defense counsel asked the trial court to be relieved of the representation when McCoy vigorously opposed the concession strategy. *Id*. The trial court instructed defense counsel to proceed with the concession strategy despite McCoy's opposition. *Id*. At trial, McCoy told the court that defense counsel was "selling him out"; he testified in his own defense, "pressing an alibi difficult to fathom." *Id*. at 1506-1507. Defense counsel conceded McCoy's guilt during his closing argument, but urged mercy due to McCoy's mental health issues. *Id*. at 1507. The jury returned a death verdict for each count. *Id*. The United States Supreme Court held that "[w]hen a client expressly asserts that the objective of '*his* defence' is to maintain innocence of the charged criminal acts, his lawyer must abide by that objective and may not override it by conceding guilt." *Id*. at 1509, quoting US Const Am VI.

In this case, there is no evidence on the record that defendant disagreed with trial counsel's concession strategy. Defendant failed to persuade this Court that it was necessary to remand this case to develop a record on this issue. *People v Watson*, unpublished order of Court of Appeals, entered February 21, 2020 (Docket No. 349242). Defendant now impermissibly attempts to expand the record by submitting an affidavit averring that he did not approve of trial counsel's concession strategy. See MCR 7.210(A) ("Appeals to the Court of Appeals are heard on the original record."); *People v Morrison*, 328 Mich App 647, 655; 939 NW2d 728 (2019) ("[T]o consider evidence presented on appeal that the parties failed to present to the trial court would be an impermissible expansion of the lower-court record."). Nonetheless, there is no evidence on the record to suggest that the averments in defendant's affidavit are true. Again, in conceding defendant's guilt on the misdemeanor domestic-violence charge in closing argument, defense counsel explained:

> I can't look at those pictures, and he can't look at those pictures and deny it. He can't do it. It's not possible. I mean, I could. I could say [']no, it didn't happen and she's lying.['] I'm not going to because I'm not taking you for fools[,] because I'm not a fool.

Defendant voiced no objection at trial.[1] And, even at sentencing, when the trial court expressly gave defendant an opportunity to address the court, he declined, even though he could have used that opportunity to express his dissatisfaction with trial counsel's strategy. The *McCoy* Court clearly distinguished the case before it from *Florida v Nixon*, 543 US 175, 125 S Ct 551, 160 L Ed 2d 565 (2004), in which the Court held that a defendant's Sixth Amendment rights are not violated by his counsel's pursuit of a concession strategy when the defendant neither approves nor disapproves of that strategy during trial court proceedings:

> Nixon complained about the admission of his guilt only after trial. McCoy, in contrast, opposed [counsel's] assertion of his guilt at every opportunity, before and

---

[1] Because the parties' arguments are not evidence, the trial court instructed the jury about the prosecution's burden of proof on all elements of the charged offenses, including the misdemeanor domestic-violence.

during trial, both in conference with his lawyer and in open court. [*McCoy*, 138 S Ct at 1509 (citation omitted).]

In this case, defendant only expressed his dissatisfaction with trial counsel's concession strategy after he was convicted and sentenced. Therefore, defendant is not entitled to new trial because there is no evidence that his Sixth Amendment right to maintain his innocence was violated, and consequently, no structural error occurred.

III. "ANONYMOUS" JURY

Defendant argues that this Court should overrule binding precedent to hold that the trial court committed a structural error when it referred to jurors by number rather than name. We disagree.

A defendant must "object to the trial court[] referring to the jurors by numbers . . . ." *People v Hanks*, 276 Mich App 91, 92; 740 NW2d 530 (2007). In this case, defendant did not object. Therefore, the issue is not preserved for review. *Id.*

This Court reviews unpreserved issues for plain error. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *Id.* at 763. "The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id.* "Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings' independent of the defendant's innocence." *Id.* at 763-764 (quotations marks and citation omitted; alteration in original).

Defendant's claim that he is entitled to a new trial fails because the trial court did not empanel an "anonymous" jury simply by referring to jurors by number rather than name. This Court has "defined an 'anonymous jury' as 'one in which certain information is withheld from the parties, presumably for the safety of the jurors or to prevent harassment by the public.' " *Hanks*, 276 Mich App at 93, quoting *People v Williams*, 241 Mich App 519, 522; 616 NW2d 710 (2000). A due process challenge to an "anonymous jury" will only succeed under Michigan's "strict definition" of that term when "something more than just the jurors' names is withheld from the parties." *Hanks*, 276 Mich App at 93. A defendant must show that the withholding of information "precluded meaningful voir dire or that the defendant's presumption of innocence was compromised." *Id.*

First, in this case, there is no evidence that the biographical information of prospective

jurors was withheld from defendant. Before voir dire began, the trial court told the prospective jurors:

> We're going to take attendance by using two numbers. The first number is your juror number. . . . The second number is your seat number . . . .
>
> * * *
>
> We're not going to use your names. I'm going to ask—to protect your privacy, and we're going to ask the lawyers to do the same, and think of their seats as your boxed seats to Comerica Park.

Although the trial court mentioned the privacy of the prospective jurors, defense counsel gave no indication that any information relevant to voir dire had been withheld from him. Instead, defense counsel's comments suggest that he had access to the jurors' names but he preferred the trial court's policy of using seat numbers as a matter of convenience:

> [Y]ears ago we used to use names, and I used to have the ability in my younger years to memorize everybody's name and go back and talk to you like on an individual basis. Now I'm older, dumber, and lazier, so I apologize. This makes it a lot easier on me , so I apologize for the seat names. I'm just going to call you seat [2], seat [8], seat 14, okay? It's not an insult. It's just a function of my inadequacies, I guess.

Second, in this case, there is nothing on the record from which the jury could have inferred that the practice was calculated to protect them from a dangerous or presumably-guilty defendant. Before the jury was selected, the trial court used numerous illustrations from history and from other judicial systems to explain at length why the presumption of innocence is the most important feature of America's criminal justice system. The trial court asked each prospective juror individually, "Do you accept the principle of law in a criminal case that the Defendant is presumed to be innocent unless proven guilty beyond a reasonable doubt? Do you accept [that] this means the burden of proof in the case rests upon the prosecution?" Given defense counsel's comments and the trial court's substantial discussions of the presumption of innocence, there is no reason to believe that the jurors inferred that the trial court's practice of using seat numbers rather than names was anything more than a matter of standard procedure or convenience. Therefore, in this case, like in *Hanks*, "[t]here is no indication that any of the jurors believed that there was any significance in the use of numbers instead of names." *Id*. at 94.

Defendant further argues that *Williams* was wrongly decided. This Court, however, is bound not only by *Williams*, but also by *Hanks*. MCR 7.215(J)(1) ("A panel of the Court of Appeals must follow the rule of law established by a prior published decision of the Court of Appeals issued on or after November 1, 1990 . . . .") Therefore, defendant's challenge fails because the trial court did not empanel an "anonymous" jury as that term is defined by *Williams* and *Hanks*.

## IV. SENTENCING

Defendant argues that the trial court did not adequately justify imposing a sentence for assault by strangulation or suffocation that exceeded the advisory sentencing guidelines range by 11 months because defendant's prior assaultive convictions and the severity of the sentencing offense were wholly accounted for by the sentencing guidelines. We disagree.

"There are no special steps that a defendant must take to preserve the question whether the sentence was proportional; a defendant properly presents the issue for appeal by providing this Court a copy of the presentence investigation report." *People v Walden*, 319 Mich App 344, 350; 901 NW2d 142 (2017). Defendant has provided this Court with a copy of his presentence investigation report (PSIR). Therefore, the issue is reviewable. *Id.*

This Court reviews a trial court's sentence outside of the advisory sentencing guidelines for an abuse of discretion. *People v Steanhouse*, 500 Mich 453, 471; 902 NW2d 327 (2017). A trial court abuses its discretion when it imposes a sentence that is not " 'proportionate to the seriousness of the circumstances surrounding the offense and the offender.' " *Id.* at 474, quoting *People v Milbourn*, 435 Mich 630, 636; 461 NW2d 1 (1990). When reviewing an out-of-guidelines sentence for reasonableness, this Court examines whether the trial court adequately explained "why the sentence imposed is more proportionate to the offense and the offender than a different sentence would have been." *People v Dixon-Bey*, 321 Mich App 490, 525; 909 NW2d 458 (2017) (quotation marks and citation omitted). The "relevant factors for determining whether a departure sentence is more proportionate than a sentence within the guidelines range continue to include (1) whether the guidelines accurately reflect the seriousness of the crime; (2) factors not considered by the guidelines; and (3) factors considered by the guidelines but given inadequate weight." *Id.* (citations omitted).

In this case, defendant's total prior record variable (PRV) score was 40 points, and his total offense variable (OV) score was 100 points. Defendant's PRV level of D, and OV level of VI on the sentencing grid for class D offenses, MCL 777.65, yielded a sentencing guidelines range of 34 to 67 months for the sentencing offense of assault by strangulation or suffocation. The trial court rejected defense counsel's arguments regarding the assessment of OVs 8 (victim asportation or held captivity beyond the time necessary to commit the offense), 12 (contemporaneous felonious acts), and 19 (interference with the administration of justice or rendering of emergency services). Defendant does not renew these arguments on appeal or otherwise assert that the guidelines were scored incorrectly.

The prosecutor requested a maximum within-guidelines sentence or an upward departure on the ground that, because defendant had abused three prior domestic partners, including AD, there was a likelihood that he would also abuse the woman he had been communicating with from jail, whom he intended to move in with upon his release from prison. AD also addressed the trial court, stating she was "convinced with absolute certainty" that the date of the assault "would be [her] last day alive." She stated, "The few hours I endured the evil wrath of [defendant] felt like an eternity in hell." AD requested that defendant be provided with mental health treatment and sentenced to the longest possible sentence available under the law: "I am positive that he will continue to manipulate and hurt women for many years to come if he isn't stopped. I am begging

you to please stop him.  If we don't, his next victim may very likely not have the luck I did and will end up dead."

The trial court examined defendant's criminal history on the record, highlighting the fact that a prior domestic violence conviction had been discharged under MCL 769.4a(1)[2]:

He has been in prison before pursuant to a Moreno Valley [California] case, which he was convicted of assault with a gun, assault with a deadly weapon, non-firearm or force to cause great bodily harm with enhancements, criminal threats, death.[3] The Defendant was sentence[d] to a total of 88 months of incarceration and was paroled in 2005 for three years.  He received six months' probation for domestic assault under [MCL] 769.4a, which boggles my mind in light of the initial felonious offenses how he would get 769.4a, but I'm sure there was a wise decision made there.

Then we have a couple other miscellaneous cases of not great import, and then this extremely egregious and despicable case.  This is a case where one wonders why uttering and publishing can be a 14-year felony, but assault . . . by strangulation is a ten-year felony, because I agree with the victims here that there should be as long as time as possible that there could be court supervision over the Defendant, [but] the law is the law.

The trial court sentenced defendant to 6½ to 10 years' imprisonment for assault by strangulation or suffocation—exceeding the advisory sentencing guidelines recommendation by 11 months.  The trial court stated:

The Court finds that the slight upward deviation of about a year is reasonable in light of the following factors: First, the guidelines do not adequately address the duration of the offense and I will take . . . as very credible testimony, although she wasn't under oath here at the moment, but as very credible evidence the victim's statement about the number of hours and the duration of the offense.

Secondly, it does not adequately address the brutality of the offense, the torture that the victim here again eloquently elaborated on.  Third, it does not adequately address his prior history and that prior supervision by the Court's failure to deter assaultive behavior.  He's already been to prison.  He was on parole.  He received the grace of the Court under 769.4a and here he is again.

---

[2] MCL 769.4a(1) provides that a trial court may, with the consent of the victim and prosecuting attorney, defer entering a judgment of guilt against a first-time domestic violence offender and place the offender on probation.

[3] The prosecution notes that it failed to timely proceed against defendant as a fourth-felony habitual offender; if it had done so, defendant's minimum sentencing guidelines range would have been 34 to 134 months' imprisonment.

And fourth, that there are three girlfriends who were abused and very credible testimony on the record in connection with that that the guidelines do not adequately consider that. I am not sentencing the Defendant in connection with these two other people that have never come before me, that there may be jail calls for or whatever. I just want the record to be clear on that.

Defendant argues that, contrary to the trial court's reasoning that the guidelines did not adequately address defendant's criminal history, his previous assault convictions were already accounted for by PRV 2 (prior low severity felony offenses) and 5 (prior misdemeanor offenses). Defendant argues that, contrary to the trial court's reasoning that the guidelines did not adequately address the brutality and the duration of the offense, 50 points were assigned to OV 7 for sadism, torture, excessive brutality or similarly egregious conduct intended to substantially increase the victim's fear or anxiety, and 15 points were assigned to OV 8 based on the trial court's finding that AD was "held captive beyond the time necessary to commit the offense."

It is arguable the trial court erred in concluding that sentencing guidelines did not adequately account for the length and brutality of defendant's assault on AD. On one hand, OV 7 and OV 8, when viewed together, arguably account for both the length and severity of an offense against a person. However, evaluating brutality and length of captivity separately and then adding them together does not account for a third distinct factor—the length of time for which the offense was brutal. In any event, the trial court provided numerous other justifications for imposing a sentence slightly above the recommended guidelines range. Defendant's contention that his criminal history was wholly accounted for by the PRVs is factually inaccurate. Because defendant's domestic violence matter against KS was discharged under MCL 769.4a, it was not a prior misdemeanor "conviction" under PRV 5. See MCL 777.50(4); MCL 777.55(3)(a). Moreover, the sentencing guidelines did not account for the fact that defendant committed his offenses against AD *after* he assaulted KS and EM, receiving either lenient or no punishment for those acts. Our Supreme Court has held that "the likelihood of the defendant reoffending" is a proper sentencing consideration. *People v Corrin*, 489 Mich 855; 795 NW2d 13 (2011). And this Court has held that failure at rehabilitation may justify an upward departure from the sentencing guidelines. *People v Solmonson*, 261 Mich App 657, 671; 683 NW2d 761 (2004). This is especially so where the defendant engages in a like pattern of criminal offenses, as here. See e.g., *People v Petri*, 279 Mich App 407, 421-422; 760 NW2d 882 (2008) (determining that departure was supported by the trial court's conclusion that the guidelines did not fully consider "the similar nature of [the] defendant's pattern of felony crimes, and the aggravating circumstances"); *Solmonson*, 261 Mich App at 671-672 (determining that the sentencing court's departure was appropriate given the "defendant's extensive history of drinking-and-driving offenses").

Finally, defendant argues that 1) the trial court did not consider any mitigating factors, and 2) the trial court did not specifically justify the 11-month magnitude of the departure it imposed. Defendant does not state what mitigating factors the trial court should have considered. Consequently, his argument is abandoned. *People v Kevorkian*, 248 Mich App 373, 388-389; 639 NW2d 291 (2001), quoting *Mitcham v Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959). Moreover, as just discussed, the trial court plainly stated its reasons for determining that the "slight upward deviation of about a year is reasonable . . . ." Defendant does not identify the formula that the trial court was required to apply to justify the 11-month departure in more mathematically-precise terms. Accordingly, the trial court did not abuse its discretion in imposing an out-of-

guidelines sentence that slightly exceeded the sentencing guidelines minimum sentence range because it sufficiently explained that the sentencing guidelines did not adequately account for the length of time that defendant subjected AD to sadism and brutality and they did not account for defendant's continued commission of a violent choking offense even after he had received lenient or no punishment for earlier engaging in similar choking acts against two prior domestic partners.

Affirmed.

/s/ Anica Letica
/s/ Michael J. Riordan
/s/ Thomas C. Cameron